IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KALDREN, LLC,<br><br>      Plaintiff,<br><br>v.<br><br>TRIPPE MANUFACTURING COMPANY<br>D/B/A TRIPP LITE,<br><br>      Defendant. | Civil Action No. 1:17-cv-6151<br><br>PATENT CASE<br><br>JURY TRIAL DEMANDED<br><br>Hon. Edmond E. Chang |

**DEFENDANT TRIPPE MANUFACTURING COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSED
<u>RULE 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>**

TABLE OF CONTENTS

|     |     |                                                                                      | Page |
| --- | --- | ------------------------------------------------------------------------------------ | ---- |
| I.  |     | Summary of the Argument                                                              | 1    |
| II. |     | Statement of Facts                                                                   | 1    |
|     | A.  | Nature and Stage of the Proceedings                                                  | 1    |
|     | B.  | The Patents-in-Suit                                                                  | 2    |
| III.|     | Argument                                                                             | 5    |
|     | A.  | Motions to Dismiss for Patent Invalidity Under 35 U.S.C. § 101 Are Proper            | 5    |
|     | B.  | Abstract Ideas Are Ineligible for Patent Protection Under 35 U.S.C. § 101            | 5    |
|     | C.  | The Patents-in-Suit Are Ineligible for Patent Protection                             | 8    |
|     |     | 1. *Alice* Step One: The claims are directed to an abstract idea                     | 8    |
|     |     | 2. *Alice* Step Two: The claims lack an inventive concept.                           | 12   |
|     | D.  | Risk of Preemption Confirms the Invalidity of the Claims                             | 15   |
| IV. |     | Conclusion                                                                           | 15   |

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alice Corp. v. CLS Bank.*
  134 S. Ct. 2347 (2014) .................................................................................... *passim*

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*,
  687 F.3d 1266 (Fed. Cir. 2013) ................................................................................ 5

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ................................................................................... 5, 6, 7

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014) ............................................................................. 14

*Chamberlain Grp., Inc. v. Linear LLC*,
  114 F. Supp. 3d 614 (N.D. Ill. 2015) ..................................................................... 14

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ..................................................................... *passim*

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ............................................................................... 5

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014) .......................................................................... 7, 15

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ............................................................................... 7

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
  839 F.3d 1089 (Fed. Cir. 2016) ............................................................................... 7

*Gottschalk v. Benson*,
  409 U.S. 63 (1972) ............................................................................................ 6, 15

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015) ............................................................................. 14

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  850 F.3d 1332 (Fed. Cir. 2017) ............................................................................. 10

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015) ............................................................................... 6

*IQS US Inc. v. Calsoft Labs Inc.*,
  No. 16 CV 7774, 2017 WL 3581162 (N.D. Ill. Aug. 18, 2017) .........................................10, 14

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  566 U.S. 66 (2012) ..............................................................................................................6, 7

*Microsoft Corp. v. AT&T Corp.*,
  550 U.S. 437 (2007) ................................................................................................................6

*O2 Media, LLC v. Narrative Sci. Inc.*,
  149 F. Supp. 3d 984 (N.D. Ill. 2016) ....................................................................................11

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
  No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017) ..............................8

*Recognicorp v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017) ...................................................................................... *passim*

*Secured Mail Solutions, LLC v. Universal Wilde, Inc.*,
  No. 2016-1728, 2017 WL 4582737 (Fed. Cir. Oct. 16, 2017) ..........................................10, 13

*Synopsys, Inc. v. Mentor Graphics Corp.*,
  839 F.3d 1138 (Fed. Cir. 2016) .............................................................................................13

*In re TLI Commc'ns LLC Patent Litig.*,
  823 F.3d 607 (Fed. Cir. 2016) .............................................................................................5, 7

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ....................................................................................5, 11, 14

**Statutes**

35 U.S.C. § 101 ................................................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ..................................................................................................1, 5

Defendant Trippe Manufacturing Company ("Tripp Lite") moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Kaldren LLC's Complaint (Dkt. No. 1) for failure to state a claim.

## I. SUMMARY OF THE ARGUMENT

The claims of the Patents-in-Suit are directed to the abstract idea of encoding or decoding data. But formatting digital data into a pattern is not new, as the specification acknowledges. Encoding or decoding of digital data is also not new. Moreover, none of the claims recites any specific hardware or software. Instead, the specification states that the alleged invention uses "off-the-shelf personal computers and peripherals" to perform conventional activities for computers and network communication like "formatting," "outputting," "determining," "scanning," "extracting," "retrieving," "processing," and "communicating." Indeed, Kaldren's patents do no more than withdraw a basic idea (encoding or decoding of data) from the public domain without disclosing any inventive application of that idea. Therefore, the Patents-in-Suit are invalid under 35 U.S.C. § 101 for failure to claim patent-eligible subject matter.

Resolving these issues does not require discovery or claim construction. Therefore, to avoid waste of judicial and party resources unnecessarily litigating invalid patents, Tripp Lite requests that the Court dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

## II. STATEMENT OF FACTS

### A. Nature and Stage of the Proceedings

Kaldren filed its Complaint on August 24, 2017, accusing Tripp Lite of infringing U.S. Patent Nos. 6,098,882 (the "'882 patent"), 6,176,427 (the "'427 patent"), 6,820,807 (the "'807 patent") and 8,281,999 (the "'999 patent") (collectively, the "Patents-in-Suit") through "testing" of a Quick Response ("QR") code that appears in an owner's manual for a Tripp Lite product:



Android App Download QR Code
Select this option from the software settings menu to view the QR code that can be scanned by an Android device and direct a user to the Windroid Linker app.

https://www.tripplite.com/shared/techdoc/Owners-Manual/9334BC.pdf

(Dkt. No. 1 ("Compl") ¶¶ 13–14; *see also id.* at Ex. E.)

      **B.**      **The Patents-in-Suit**

According to the Abstract,[1] the Patents-in-Suit are directed to a "method of formatting digital data and a method of decoding the formatted digital data" using "user selectable format parameters" to "vary the dimensions and other attributes of spots and the cells containing those spots," which the "formatting process formats into a pattern." ('882 patent at Abstract; '427 patent at Abstract; '807 patent at Abstract; '999 patent at Abstract.) The independent claims generally relate to methods and systems for "encoding data" (*see, e.g.*, '882 patent, cls. 1, 12, 21, 25, 29, 32, 34, 48), "decoding data" (*see, e.g.*, '427 patent, cls. 1, 9, 17, 24, 26, 35; '807 patent, cls. 12, 20; '999 patent, cls. 1, 6, 7, 8, 9, 11, 12, 13, 14), and "encoding" and "decoding" data (*see e.g.*, '807 patent, cls. 1, 3).

The specification concedes that "the prior art discloses methods for placing machine readable information on media such as paper." ('807 patent at 1:51–53.) The specification also concedes that the idea of formatting data into patterns and then decoding the data is not new. (*Id.* at 2:10–14.) For example, the specification notes the prior existence of "digital information being stored on paper [via] the use of bar codes." (*Id.* at 1:60–61.) Two-dimensional codes are also in

---

[1] All four Patents-in-Suit share a similar specification.

the prior art. (*Id.* at 1:63–67.) The applicants' goal was to "substantially increase the amount of data that can be stored within a given amount of paper." (*Id.* at 3:41–42.)

None of the claims provides any meaningful limitations on the idea of formatting or encoding digital data and then decoding the formatted digital data. Instead, the claimed methods and systems can be carried out in "any manner" using "off-the-shelf" components. For example, the specification describes one of the objectives of the invention as "a method that writes and reads digital data on paper and other media using ***off-the-shelf personal computers and peripherals***, and achieves the full carrying capacity these off-the-shelf components can sustain." (*Id.* at 4:21–25 (emphhasis added).) The specification further describes the invention as "act[ing] as a channel for digital communication the ability to link the printed page to the electronic world ***can be accomplished in any manner*** in which instructions can be digitized." (*Id.* at 50:14–16 (emphasis added).) The third column below identifies the generic computing concepts of the representative claims from each patent:

| Claim Element | Claim Language | General Computing Concept |
|---|---|---|
| **'882 patent** | | |
| 1 (preamble) | A method of encoding data on a substrate as digital data comprising: | |
| 1.a | formatting the data into a series of digital data values wherein said series of digital data values are formatted into a pattern comprising a plurality of spaces at least some of which have dimensions M pixels by N pixels wherein at least one bit in said series of digital data values are represented in each of said plurality of spaces where at least one logical state is expressed by the presence in the space of a spot size with dimensions X pixels by Y pixels and at least one other logical state is expressed by the absence of a spot with dimensions X pixels by Y pixels from the space and where at least one of dimensions M, N, X, and Y is capable of differing from at least one other of the dimensions M, N, X, and Y; and | Formatting data |

| | | |
|---|---|---|
| 1.b | outputting said pattern onto at least one substrate, such that the data is represented in digitized form on said at least one substrate. | Outputting data |
| **'427 patent** | | |
| 9 (preamble) | A method of decoding digital data values from a pattern, the method comprising: | |
| 9.a | determining formatting information concerning a plurality of first cells contained in a first portion of the pattern from a first feature contained in a second portion of the pattern; | Reading and decoding data |
| 9.b | determining the locations of the first cells; and | Reading data |
| 9.c | deriving digital data values from the cells by using the formatting information provided by the first feature. | Extracting data |
| **'807 patent** | | |
| 20 (preamble) | A method for retrieving an information resource, the method comprising: | |
| 20.a | scanning a machine readable indicia comprising digital data values formatted into a two dimensional pattern; | Reading and decoding data |
| 20.b | extracting an address of the information resource from the machine readable indicia; and | Extracting data |
| 20.c | retrieving the information resource for presentation to a user. | Retrieving data |
| **'999 patent** | | |
| 1 (preamble) | A communication system comprising: | |
| 1.a | processing means for decoding a machine-readable code formatted into a two dimensional pattern where that machine-readable code contains contact information, whereby the contact information is derived, | Processing data |
| 1.b | communicating means for communicating where said communicating means communicates using the contact information derived from the processing means, and, | Communicating data |
| 1.c | networking means for communicating with other computers in the network, and where the machine-readable code which contains digital data comprising contact information further comprises digital data for communicating with other computers on said network. | Sending data |

As shown above, the claims recite generic functional steps, like "processing," "sending," "formatting," "outputting," and "decoding" data, and generic computer components, like "machine-readable code," "computers," and "network."

4

## III. ARGUMENT

### A. Motions to Dismiss for Patent Invalidity Under 35 U.S.C. § 101 Are Proper

Whether the Patents-in-Suit are directed to ineligible subject matter under 35 U.S.C. § 101 is a "threshold test." *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). "[S]ubject matter eligibility is the primal inquiry, one that must be addressed at the outset of litigation." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring). Patent eligibility under § 101 is a question of law. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011). Accordingly, this Court may resolve the issue of patent eligibility under § 101 by way of this motion to dismiss. *See, e.g.*, *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016) (affirming dismissal under Rule 12(b)(6)); *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014) (same).

While claim construction may at times be desirable to resolve whether a patent claim is directed to patent-eligible subject matter, the Federal Circuit has explained that "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2013). Where the court has a "full understanding of the basic character of the claimed subject matter," the question of patent eligibility may properly be resolved on the pleadings. *Content Extraction*, 776 F.3d at 1349 (affirming dismissal under § 101 without having a claim construction hearing). Considering the issue of patent eligibility now will save judicial and party resources by avoiding unnecessary discovery and claim construction on patent claims that are not eligible for protection.

### B. Abstract Ideas Are Ineligible for Patent Protection Under 35 U.S.C. § 101

Under § 101, an inventor may obtain a patent on "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has recognized that "laws of nature, physical phenomena, and abstract

5

ideas" are not patent eligible. *Bilski*, 561 U.S. at 594. Such concepts constitute the "basic tools of scientific and technological work," the monopolization of which "might tend to impede innovation more than it would tend to promote it." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

The Supreme Court set the bar on patent subject matter eligibility for computer-implemented patent claims in *Alice Corp. v. CLS Bank*. 134 S. Ct. 2347, 2352 (2014). In *Alice*, the Supreme Court held that the two-step process to determine whether a patent is invalid for claiming ineligible subject matter in *Mayo* also applies to computer-implemented claims. First, this Court must "determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Id.* at 2355. In this first step, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). If the claims are directed toward an abstract idea, then step two of the *Alice* test requires this Court to determine whether the claims contain "an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 566 U.S. at 78). It is insufficient to add elements which "consist of well-understood, routine, conventional activity," if such elements, "when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Mayo*, 566 U.S. at 79–80. Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358.

The Supreme Court has recognized that information itself is intangible. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 451 n.12 (2007). As a result, the Federal Circuit has found claims directed to some combination of collecting information, organizing information, analyzing information, and/or displaying the information to be abstract. *See FairWarning IP, LLC v. Iatric*

*Sys., Inc.*, 839 F.3d 1089, 1094–95 (Fed. Cir. 2016) (claims "directed to collecting and analyzing information to detect misuse and notifying a user when misuse is detected" were drawn to an unpatentable abstract idea); *TLI Commc'ns*, 823 F.3d at 611 (claims were "directed to the abstract idea of classifying and storing digital images in an organized manner"); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (claims directed to an abstract idea because "[t]he advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions"); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350–51 (Fed. Cir. 2014) (organizing existing data into a new form was directed to an abstract idea).

In addition, courts have found it helpful to assess claims against the policy rationale for § 101. The Supreme Court stated that the "concern that undergirds [the] § 101 jurisprudence" is preemption. *Alice*, 134 S. Ct. at 2358. The concern underlying the abstract idea doctrine is that a patentee might disproportionately "pre-empt" all ways of achieving results claimed by the patent. *Mayo*, 566 U.S. at 71 (preemption would "tend to impede innovation more than would tend to promote it."). Thus, if a claim is so abstract that it "pre-empt[s] use of [the claimed] approach in all fields, and would effectively grant a monopoly over an abstract idea," it is not patent eligible. *Bilski*, 561 U.S. at 612. Importantly, the inverse is not true: "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *FairWarning*, 839 F.3d at 1098 (internal quotation marks and citation omitted).

Under the two-step *Alice* test and for subject-matter eligibility, and confirmed by a high risk of preemption, the claims of the Patents-in-Suit are invalid.

C.     **The Patents-in-Suit Are Ineligible for Patent Protection**

1.     <u>*Alice* Step One</u>: **The claims are directed to an abstract idea.**

Claim 20 of the '807 patent (set forth in full above) is representative of the claims.[2] *See, e.g.*, *Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*, No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938, at *8–9 (E.D. Tex. Mar. 8, 2017) (invalidating 974 claims after analyzing only a few "representative claims" where the other claims were "substantially similar" and "linked to the same abstract idea."). Claim 20 recites a "method for retrieving an information resource" consisting of: (1) scanning a pattern; (2) decoding (extracting) an address from the pattern; and (3) retrieving information from the decoded address. ('807 patent at 52:16–24.) The remaining claims are similarly directed to the idea of encoding and/or decoding data, then doing something conventional with that data.

Courts have found similar patent claims to be ineligible. In *Content Extraction*, the claims generally recited "a method of 1) extracting data from hard copy documents using an automated digitizing unit such as a scanner, 2) recognizing specific information from the extracted data, and 3) storing that information in a memory." *Content Extraction*, 776 F.3d at 1345. The claimed method "could be performed by software on an automated teller machine (ATM) that recognizes information written on a scanned check, such as the check's amount, and populates certain data fields with that information in a computer's memory." *Id*. The Federal Circuit concluded at *Alice*'s first step that the claims were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory"—put simply, data recognition and storage. *Id.* at 1347. Rejecting the plaintiff's argument that the claims

---

[2] Where claims are "substantially similar and linked to the same abstract idea," courts may look to representative claims in a § 101 analysis. *Content Extraction*, 776 F.3d at 1349.

were not abstract because they required the use of a scanner, the Federal Circuit likened the claims to those found abstract in *Alice*, which "also required a computer that processed streams of bits." *Id*. Like the *Content Extraction* claims, claim 20 of the '807 patent is abstract because it simply "scan[s] . . . a two-dimensional pattern" (obtains an image), "extract[s] an address of the information resource" (decodes the image to obtain a URL), and "retriev[es] the information resource" (retrieves information). *See id*. The claims in *Content Extraction* were directed to data recognition and storage, whereas claim 20 of the '807 patent is directed to data recognition and retrieval—the former claims stored the recognized data, while the latter claims retrieve additional data based on the recognized data.

Recently, in *Recognicorp v. Nintendo Co.*, the Federal Circuit found the patent claim at issue was directed to the abstract idea of "encoding and decoding image data." 855 F.3d 1322 (Fed. Cir. 2017). The claim at issue in *Recognicorp* recited:

> 1. A method for creating a composite image, comprising:
>
> > displaying facial feature images on a first area of a first display via a first device associated with the first display, wherein the facial feature images are associated with facial feature element codes;
> >
> > selecting a facial feature image from the first area of the first display via a user interface associated with the first device,
> >
> > wherein the first device incorporates the selected facial feature image into a composite image on a second area of the first display, wherein the composite image is associated with a composite facial image code having at least a facial feature element code and wherein the composite facial image code is derived by performing at least one multiplication operation on a facial code using one or more code factors as input parameters to the multiplication operation; and
> >
> > reproducing the composite image on a second display based on the composite facial image code.

*Id*. at 1324. The Federal Circuit described the claim as a "method whereby a user displays images on a first display, assigns image codes to the images through an interface using a mathematical

9

formula, and then reproduces the image based on the codes." *Id.* at 1326. The Federal Circuit found that this method reflected "standard encoding and decoding." *Id.*

The Federal Circuit then explained that encoding and decoding data is "an abstract concept long utilized to transmit information." *Id.* (citing *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340–41 (Fed. Cir. 2017) (organizing, displaying, and manipulating data encoded for human- and machine-readability is directed to an abstract concept)). The Federal Circuit provided several examples of long-utilized methods of encoding and decoding of data to transmit information: "Morse code, ordering food at a fast food restaurant via a numbering system, and Paul Revere's 'one if by land, two if by sea' signaling system." *Id.* Like the claim in *Recognicorp*, claim 20 of the '807 patent is directed at a method of "decoding" data, which is an abstract concept.

The idea underlying claim 20 of the '807 patent is just as abstract as that of the *Content Extraction* and *Recognicorp* claims. Claim 20 does not include any specific limitations or steps regarding the actual decoding of data. Rather, all of the steps of the method are directed to the generic, conventional ideas of reading a pattern, decoding the pattern, then doing something conventional based upon the decoded information. But generating and decoding a QR code and then retrieving information based on that decoded information is abstract. *Secured Mail Solutions, LLC v. Universal Wilde, Inc.*, No. 2016-1728, 2017 WL 4582737, at *5 (Fed. Cir. Oct. 16, 2017) (finding claims directed to "a method whereby a [QR code] is generated, affixed to a mail object, and sent through the mail system . . . [t]hen, upon receipt, the barcode is scanned, and data corresponding to the sender is sent to the recipient over the network and displayed on the recipient's device" abstract under *Alice* step one); *see also IQS US Inc. v. Calsoft Labs Inc.*, No. 16 CV 7774, 2017 WL 3581162, at *4 (N.D. Ill. Aug. 18, 2017) (finding claims directed to "receiv[ing] and

compar[ing] . . . templates" without describing "how the templates are compared" abstract); *O2 Media, LLC v. Narrative Sci. Inc.*, 149 F. Supp. 3d 984, 993 (N.D. Ill. 2016) (finding claims directed to "identifying, organizing, and presenting information" abstract).

Like claim 20 of the '807 patent, independent claims 1, 9, 17, 24, 26, and 35 of the '427 patent, independent claim 12 of the '807 patent, and independent claims 1, 6, 7, 8, 9, 11, 12, 13, and 14 of the '999 patent are directed to "decoding data." For example, claim 9 of the '427 patent (set forth in full above) consists of functions for: (9.a) determining formatting information concerning a pattern (i.e., reading and decoding data); (9.b) determining the locations of data (reading data); and (9.c) deriving data from a pattern (extracting data). Claim 1 of the '999 patent (set forth in full above) consists of functions for: (1.a) processing the decoding of a two-dimensional pattern containing contact information (processing data); (1.b) communicating data; and (1.c) sending data over a network. That claim 1 of the '999 patent sends and receives the decoded information over a network does not make it any less abstract. *See, e.g., Ultramercial*, 772 F.3d at 716 (noting that "the use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101") (citation omitted). These claims are just as abstract as claim 20 of the '807 patent.

The other independent claims are directed to "encoding" data ('882 patent, cls. 1, 12, 21, 25, 29, 32, 34, 48) or both "encoding" and "decoding" data ('807 patent, cls. 1, 3), which does not change the analysis. For example, claim 1 of the '882 patent (set forth in full above) is directed to "a method of encoding data on a substrate as digital data" that consists of: (1.a) formatting a two-dimensional pattern defined by "pixels"; and (1.b) outputting the pattern onto a substrate. These steps demonstrate a drafting effort to monopolize the abstract idea of formatting a pattern. Claim 1 of the '882 patent is written so broadly that it captures the use of any word processor. For example,

a word processor can be used to "encod[e] data into a pattern for output to a substrate" because information can be encoded into words (a pattern), which can then be printed. A letter (or a symbol) represents part of the information. The word processor can define at least one attribute of the letter (size) in terms of "printer pixels," as demonstrated in the following figure, where the letter "A" is 7 units by 6 units in size:



A word processor can also format letters into the overall words (patterns). Thus, claim 1 of the '882 patent, and the other claims directed to "encoding data," or "encoding" and "decoding" data, are so abstract that they can read on all word processors.

The dependent claims of the Patents-in-Suit are similarly abstract and refer only to standard computing means for encoding and decoding data. For example, claim 21 of the '807 patent and claim 5 of the '999 patent both require simply that the decoded information be a URL. Claim 4 of the '999 only requires that the specified network be the Internet. Claim 14 of the '807 patent indicates that the decoded information identifies the location of a webpage. The dependent claims of the '427 patent and the '882 patent generally specify formatting attributes of the pattern.

None of the claims in the Patents-in-Suit is directed to anything more than the bare idea of encoding or decoding data. Kaldren's claims all fail the first step of the *Alice* test.

### 2. *Alice* Step Two: The claims lack an inventive concept.

To save a patent in step two, an inventive concept must be evident in the language of the claims. *Recognicorp*, 855 F.3d at 1327 (citing *Alice*, 134 S. Ct. at 2357 ("[W]e must examine the

elements of the claim to determine whether it contains an 'inventive concept.'")). In other words, any purported advantages of a claimed invention must be found in the claims themselves. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves."). Thus, tying purported advantages listed in the specification to certain limitations in a claim is insufficient. As the Supreme Court stated in *Alice*, "the relevant question is whether the claims here do more than simply instruct the practitioner to implement [on a generic computer] the abstract idea of" encoding or decoding data. *Id.* The claims here do not.

The claims recite steps that are well-understood conventional activities for computers and network communication—"defining," "formatting," "determining," "deriving," "scanning," "extracting," "retrieving," "processing," "imaging," and "communicating." A general-purpose computer and conventional network infrastructure can perform these steps with minimal, non-specialized programming. These steps show no inventiveness in the claims. Rather, they merely describe the functions of the abstract idea itself, without particularity, which is not enough under step two. *See Secured Mail*, 2017 WL 4582737, at *6 (finding that claims directed to encoding and decoding a QR code failed *Alice*'s second step because the claims were "non-specific and lack[ed] technical detail").

Similar to the invalidated claim in *Recognicorp*, nothing in Kaldren's claims "'transforms' the abstract idea of encoding and decoding into patent-eligible subject matter." 855 F.3d at 1328 (citing *Alice*, 134 S. Ct. at 2357); *see also Secured Mail*, 2017 WL 4582737, at *6 ("We see no inventive concept that transforms the nature of the [QR code] claims into a patent-eligible application of the abstract idea."). Here, the claims are written in such broad functional terms and do not recite any specific hardware required to implement the purported invention. The

13

specification confirms that the claims can be implemented using "off-the-shelf personal computers and peripherals." (*See, e.g.*, '807 patent at 4:21–25.) For example, the "outputting" recited in claim 1 of the '882 patent can be acheived by using an "off-the-shelf laser printer" (*id*. at 13:24–27), the "scanning" recited in claim 20 of the '807 patent can be achieved by using "any scanner capable of producing a flatbed image" (*id.* at 27:33–36), and the decoding and encoding recited in all of the independent claims can be achieved on a "personal computer having 80386 model microprocessor or higher, at least 4 MB RAM, using the Windows operating system" (*id.* at 9:14–17). Using conventional computer components that operate in the manner in which they are intended (i.e., conventionally) to perform basic computer functions does not give rise to patent eligibility. *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015); *see also IQS US*, 2017 WL 3581162, at *5 (patent's "generic descriptions of computer components . . . do not rise to the level of inventive concept").

The claims of the Patents-in-Suit do not purport to improve the functioning of the computer or the claimed network. *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."). Nor do the "claims have a clear concrete and tangible form." *See Chamberlain Grp., Inc. v. Linear LLC*, 114 F. Supp. 3d 614, 626 (N.D. Ill. 2015). The dependent claims' invocation of URLs and the Internet does not add an inventive concept. *Ultramercial*, 772 F.3d at 716 (narrowing an abstract idea to the "particular technological environment" of the Internet is not sufficient to save otherwise abstract claims from ineligibility).

Courts have repeatedly held that the presence of generic computing elements (e.g., "formatting, and "processing") and generic computer components (e.g., "network" and "computer") like the kind recited in the claims of the Patents-in-Suit do not make an otherwise

abstract idea patent-eligible. *See, e.g.*, *buySAFE*, 765 F.3d at 1355; *see also Content Extraction*, 776 F.3d at 1348 ("At most, [the] claims attempt to limit the abstract idea of recognizing and storing information from hard copy documents using a scanner and a computer to a particular technological environment. Such a limitation has been held insufficient to save a claim in this context."). The recited limitations—whether considered individually or as an ordered combination—are insufficient to add "significantly more" to the abstract idea. Because they are altogether devoid of any "inventive concept," the claims of the Patents-in-Suit are thus patent-ineligible under § 101. *See Alice*, 134 S. Ct. at 2359–60.

### D. Risk of Preemption Confirms the Invalidity of the Claims

The claims are exceptionally broad without any meaningful limitations. Representative claim 20 of the '807 patent is written so broadly that it could conceivably read on decoding any address. Indeed, each of the claims is "so abstract and sweeping" as to cover any and all uses of the underlying abstract idea in practically any field that uses a two-dimensional code. *See, e.g.*, *Digitech*, 758 F.3d at 1351 (claims to a general process for combining two data sets into a device profile were "'so abstract and sweeping' as to cover all uses of a device profile" (quoting *Benson*, 409 U.S. at 68)). Finding that the claims recite patentable subject matter would preempt the use of two-dimensional code. This result is exactly what *Alice* is intended to prevent. The asserted claims are invalid on their face.

## IV. CONCLUSION

Kaldren's claims are directed to abstract ideas and lack an inventive concept. Because the Patents-in-Suit are directed to patent-ineligible subject matter, Tripp Lite respectfully requests that the Court grant its motion and dismiss Kaldren's Complaint with prejudice.

Dated: November 6, 2017            Respectfully submitted,

                 By: */s/ Marshall J. Schmitt*
                 Marshall J. Schmitt
                 Illinois Bar No. 6184893
                 Larry L. Saret
                 Illinois Bar No. 2459337
                 **MICHAEL BEST & FRIEDRICH LLP**
                 444 West Lake Street
                 Suite 3200
                 Chicago, IL  60606
                 (312) 222-0800 (Telephone)
                 (312) 222-0818 (Facsimile)

                 Neil J. McNabnay
                 mcnabnay@fr.com
                 Texas Bar No. 24002583
                 Theresa M. Dawson
                 tdawson@fr.com
                 Texas Bar No. 24065128
                 **FISH & RICHARDSON P.C.**
                 1717 Main Street, Suite 5000
                 Dallas, Texas 75201
                 (214) 747-5070 (Telephone)
                 (214) 747-2091 (Facsimile)

                 **COUNSEL FOR DEFENDANT TRIPPE MANUFACTURING COMPANY DBA TRIPP LITE**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on November 6, 2017, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5.5(b).

                 */s/ Marshall J. Schmitt*